J-S06038-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RYAN PARSONS | : | |
| | : | |
| Appellant | : | No. 1262 EDA 2020 |

Appeal from the Judgment of Sentence Entered May 27, 2017
In the Court of Common Pleas of Delaware County Criminal Division at
No(s):  CP-23-CR-0003875-2016

BEFORE:   PANELLA, P.J., NICHOLS, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:               **FILED APRIL 15, 2021**

Ryan Parsons (Parsons) appeal *nunc pro tunc* from the judgment of sentence imposed on May 25, 2017, in the Court of Common Pleas of Delaware County (trial court) after his bench conviction of one count each of Murder in the First Degree, Aggravated Assault and Firearms not to be Carried without a License and two counts each of Recklessly Endangering Another Person (REAP) and Possession of an Instrument of Crime (PIC).[1] Parsons challenges the weight and sufficiency of the evidence and the admission of opinion

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502(a), 2702(a)(1), 6106(a)(1), 2705 and 907(a), respectively.

testimony of Detectives Robert Whitaker and Michael Jay.  After our thorough review, we affirm.

The charges in this matter arose as the result of the August 4, 2015 homicide of seventeen-year-old Tyzea Fulton (Fulton) and aggravated assault of his cousin, nineteen-year-old Leroy Spence (Spence).

Trial commenced on March 27, 2017.  The Commonwealth presented fourteen witnesses.  Parsons did not present any witnesses or testify on his own behalf.  The pertinent facts and procedural history are not materially disputed.  We take them from our independent review and the trial court's September 1, 2020 opinion.

## I.

## A.

Spence testified that he and Fulton were in a burgundy red Buick in Chester County, Pennsylvania, on the evening of August 4, 2015.  Fulton drove and Spence was the front seat passenger.  As they pulled away from a stop sign at the corner of 9th and Lincoln Streets, he heard a voice coming from the right side of the vehicle say, "yo."  As he looked up, shots rang out, shattering the Buick's rear driver's side window.  (*See* N.T. Trial, 4/05/17, at 27, 29, 34).

Spence immediately ducked down to the floor, waiting until the shots stopped before looking up and seeing that Fulton had been shot.  Spence, 6' 4" tall, was able to drive off from his crouched position on the floor by using

his hands for the gas pedal and steering wheel and peering over the dashboard. Driving that way, he took Fulton to Chester Crozer Hospital and ran inside to alert hospital personnel that Fulton was injured in the car. Spence called his mother and left the hospital with her. Upon arriving at home, Chester City Police Detectives Robert Whitaker and Michael Jay of the Delaware County Criminal Investigation Division (CID) were already there. Spence told the detectives he did not know who shot at them. Fulton died at the hospital of his injuries. (***See id.*** at 35-38, 40, 45).[2]

**B.**

Sergeant Katrina Blackwell, a thirteen-year employee of the Chester City Police Department, was patrolling in the neighborhood of 9th and Lincoln Streets. When she was approximately four houses away, she heard rapid gunfire. She immediately called in the incident to DelComm and ran toward the incident scene, which was eight seconds away. When she reached the intersection, she observed an individual, later identified as Parsons, staggering behind a black SUV before falling to the ground on Hughes Street and telling the sergeant, "they shot me." (N.T. Trial, 3/27/17, at 141). He did not

---

[2] Spence and his mother testified pursuant to material witness warrants, which resulted in a six-day recess to secure their attendance at trial. Nicole Dixon, Spence's mother, corroborated Spence's version of events. She testified that the detectives did not tell her son what to say or make any promises or threats and that her son told them he did not know who the shooter was. (***See*** N.T. Trial, 4/05/17, at 46-47, 54-62).

identify who "they" were.  Sergeant Blackwell called for paramedics and other backup and unsuccessfully tried to talk to individuals at the scene.[3]  She testified that a surveillance video of the incident fairly depicted what she witnessed.  (*See id.* at 134-38, 141-42, 145-46).

**C.**

Office William Swanson, a patrolman with the Chester City Police Department Crime Scene Investigation unit, reported to the shooting at 9th and Lincoln Streets.  In the 900 block of Lincoln Street, he took photographs and collected evidence that included four spent shell casings and a cigarette.  On the 800 block of Hughes Street, he collected a sneaker that matched the one brought in with Parsons at the hospital.  He also took blood samples from Lincoln and Hughes Streets that the parties stipulated matched Parsons' DNA.  At the hospital, Swanson took pictures of the burgundy red 1999 Buick Regal's rear door and headrest that exhibited holes through which a projectile had passed.  (*See* N.T. Trial, 3/28/17, at 200-05, 212, 216-218, 221).

_____

[3] Francis Smiley, Sr., a paramedic called to the scene, testified that Parsons had a gunshot wound in the right lower quadrant and puncture wound in the right buttock.  When he asked [Parsons] how many shots he heard, Parsons told him six.

**D.**

Now retired Chester City Police Detective Robert Whitaker was the primary detective on this case. When he arrived at the scene, he spoke with Sergeant Blackwell. He testified that he knows Parson's voice and recognizes his physical characteristics because he had known Parsons for approximately seven years, had seen him at least forty times and spoken with him between ten and twenty occasions.

Detective Jay of the CID testified that he was assigned to assist Detective Whitaker in investigating Fulton's homicide. Detective Jay is familiar with the intersection where the shooting occurred and explained that Sherllyn Market is on the northwest corner and Happy House Chinese Restaurant is on the southwest corner, and that both establishments had inside and outside surveillance cameras. (*See* N.T. Trial, 3/27/17, at 68-69, 71-73).

Detective Jay testified that upon their arrival at the intersection of 9th and Lincoln Streets, the detectives spoke with an employee of Happy House, Sauyk Chen, who told them that nine surveillance cameras were operational on August 4 and 5, 2015, and depict different angles of 9th and Linden Streets. Detective Jay confirmed that the time shown on the cameras two and three lined up and showed foot traffic at the intersection. He also testified that channels 2, 4, 6 and 7 of the surveillance cameras at Sherllyn Market showed the subject scene. (*See id.* at 44-45, 53, 73-76, 95).

Detective Whitaker immediately was able to recognize Parsons on the video surveillance footage from Sherllyn Market. The video showed Parsons come out from the area in the 800 block of Hughes Street, commonly referred to locally as "the cut." From there, Parsons ran after a burgundy red Buick driving down the street. Once the vehicle was stopped at the intersection, Parsons approached its driver's side rear passenger door. From there, Detective Jay could see a muzzle flash in the video, followed by Parsons falling to the ground, getting up, limping around a black SUV parked on the street and stumbling down Hughes Street where an individual in a white t-shirt picked up two guns from where Parsons fell and ran down 9th Street. (**See** N.T. Trial, 4/05/17, at 76-77).

Detective Luby is a federal law enforcement officer who had contact with Parsons one or two times each month. Detectives Whitaker and Jay showed him the surveillance video and he also identified Parsons as the individual with the gun by his facial features, expressions and height.

Detective Whitaker also testified about Parson's telephone calls[4] from the federal prison after his arrest. The calls were played for the court and Parsons can be heard speaking of "two young bulls being out there with him

---

[4] Joseph Ridka, a special investigator at the Federal Detention Center in Philadelphia, testified that the detention center keeps logs and records of all prisoners' phone calls. (**See** N.T. 3/28/17, at 32-45); (**see also** Exhibits C-27 (phone logs), C-28 (phone call records).

(as seen in the videos); shit was going down, I was running; not sure if the camera got me, 'big head' is father of one of the individuals and doesn't know why he would go against the good [(*i.e.,* will not snitch)]." Detective Whitaker explained that the person on the surveillance video wearing a white t-shirt and picking up two guns from where Parsons fell is named Womack and is related to the person Parsons identified as "big head." The detectives went to Womack's home, but were unable to speak with him.

**E.**

Detective Louis Grandizio, a six-year firearms examiner for the CID, testified as an expert in the field of firearms and forensic firearms and tool mark identification. He examined four bullet specimens from the medical examiner's office, which included one uncoated lead 44-caliber bullet from the right upper chest of Fulton, a 40-caliber bullet from the middle of Fulton's chest, and a brass jacket bullet fragment from Fulton's upper right leg. He also examined five cartridge casings from the Chester City Police Department and a brass bullet jacket fragment. Four of the five casings and the jacket fragment were all from the same 40-caliber Remington and one was from a 9-mm Luger, Tulammo headstamp. (***See id.*** at 191, 195-96, 201-06, 261).

Detective Grandizio determined that three different firearms were involved in the shooting; a 40-caliber, 9-mm and 44-caliber. He opined that the photographic and bullet evidence was consistent with Parsons running up on the rear drivers' side of the vehicle and firing through the rear passenger's

side door and shooting Fulton in the back. The detective agreed that the still photograph captured from the surveillance video shows Parsons with an object in each hand that were "consistent with being firearms." (*Id.* at 222; *see id.* at 206-08, 210-211, 219).

William Popowick was qualified as an expert witness in video surveillance equipment and forensic video surveillance enhancement. He examined six video clips and was able to make still photos. In his report, he identifies Parsons with a silver automatic handgun. A muzzle flash can be seen on the video from inside the vehicle, after which Parsons is seen coming from around the vehicle toward the curb.

Doctor Jessica Niewodowski, a Crozer Chester Medical Center trauma surgeon qualified as an expert witness in the field of trauma surgery and critical care treatment, testified that on August 4, 2015, Parsons came by ambulance for a gunshot wound to his right lower quadrant requiring surgery on his bowel and hip and Parsons' use of a wheelchair. When she was shown the video from the incident, Dr. Niewodowski opined that the man falling and hopping behind a black SUV was consistent with a man who suffered Parsons' injuries. (*See* N.T. Trial, 3/27/2017, at 01-17, 21-22); Exhibit C-23 (Parsons' medical records).

**F.**

Commonwealth witness Carlos Pena (Pena) was arrested in July 2015 on drug-related charges related to his possessing and delivering of a

significant amount of crack cocaine in Philadelphia. Pena agreed to cooperate with federal agents by identifying his supplier. He pleaded guilty to federal charges on October 14, 2015, and was taken into custody. No promises or threats were made to induce his plea, "he was caught red handed and had to man up to it hoping for a benefit in the end." After his plea, Pena was sent to George W. Hill Correctional Facility (GWHCF), where Parsons, who went by the nick-name, "Philly," was his "cellie."[5] The two men became close, playing cards and talking. When Pena asked Parsons why he was in a wheelchair, Parsons told him he had been shot and told him about the murder. Thereafter, on January 29, 2016, Pena met with Detectives Whitaker and Jay, providing them with a statement and later testifying at Parsons' trial. (**See** N.T. Trial, 3/27/17, at 75, 82, 86, 88-89, 93-94).

The trial court describes Pena's testimony and statement as follows:

> Over time, [Parsons] went on to explain that one night he was coming of the bar when he noticed a burgundy car with tinted windows. The driver's side window was down, and [Parsons] could tell who was driving. [He] ran through a little "cutaway" where he saw the car stop behind traffic. [Parsons] ran up from the back of the vehicle on the driver's side passenger area when he began firing at the car and its occupants. [Parsons] told Pena that he had two guns with him, an automatic and one, a judge, which shoots shotgun shells. [Parsons] told Pena that "one gun is the kill and the other one is to back people up in case he got to get out of there, that's the automatic one." (N.T. Trial, 3/27/17, at 95). As he was shooting at the car, one of the occupants shot

---

[5] Special investigator Ridka testified that Parsons and Pena were cell mates from October 29, 2015, to November 24, 2015. (**See** N.T. 3/28/17, at 36-37); **see also** Exhibit C-26 (cell assignments).

back at him, [Parsons] got hit and started backing up, eventually falling between two cars. Some of [Parsons'] friends picked up the guns and ran off, right before a female officer came over to talk to [Parsons]. [Parsons] told Pena that he hoped the video footage from the buildings didn't catch him, and that he knows that there's a lapser time on the camera when it[] spins, so he should be okay. Pena testified that he did not trust the guards at GWHCF but told federal agents that he had information on his cellmate …. Pena's recorded statement was played for the [c]ourt and Pena testified that the recording was accurate. (*See id.* at 94-96).

(Trial Court Opinion, 9/01/20, at 10) (record citation formatting provided));

(*see also* Exhibit C-31 (transcript of Pena's recorded statement)). On cross-examination, Pena admitted that his sentencing in his drug case had been postponed, that he had juvenile arrests that were not on his record, that he utilized several aliases and that he was no longer facing a mandatory twenty-five-year sentence because the Assistant United States Attorney (AUSA) filed a 5K1 motion.[6] (*See* N.T. Trial, 3/28/17, at 186-88).

Special Agent Wayne Netzler, a Special Agent Criminal Investigator at the Drug Enforcement Administration, was present for Pena's entire interview and testified that Pena was never threatened or offered anything in exchange for his statement. (*See* N.T. Trial, 3/28/17, at 64-67).

Detective Jay testified that no one had access to either the criminal complaint or police report prior to when it was approved by the District

---

[6] A 5K1 motion is made by a prosecutor on a defendant's behalf when he provides information in another case and reduces the incarceration time a defendant faces.

Attorney on April 1, 2016. He testified that Pena's statement contained significant details that were not made public, including the subject car's make and model, that Parsons ran up to it, the manner in which he was injured, the type of guns used and what happened to them once he had been shot, and Parson's use of the word "cut" as the alleyway in Chester, a place Pena never had been.

At the conclusion of the trial, the court took the matter under advisement and on April 11, 2017, it issued Findings of Fact and Conclusions of Law in which it found all the Commonwealth's witnesses credible and the exhibits accurate. Specifically, as to Pena, it acknowledged that on cross-examination, Pena admitted to arrests that were not on his record and to several aliases. It also noted that his sentencing on his own conviction had been postponed and that although he was facing twenty-five years on his newest arrest, that was no longer the case because of the AUSA's 5K1 motion. (*See* Findings of Fact, at Paragraph 41). However, it concluded that Pena's testimony as to what Parsons told him about the incident in question was credible and corroborated by the evidence. (*See* Conclusion of Law, at Paragraph 5).

It also concluded that the videos and photos showed Parsons running toward the Buick, coming around it with at least one gun, falling behind the SUV, losing a sneaker and then getting up and hopping across Lincoln Street toward Hughes. The court also concluded that the video shows two black

males running for Hughes Street to where Parsons fell, the male in the white t-shirt picking up two guns that are clearly visible on the video, and that the man then proceeded around the corner onto 9th Street. Finally, the court found that Parsons incriminated himself in the prison phone call. Based on all of the foregoing, the court found that the evidence, when taken in its entirety, "both quantitatively and qualitatively, unequivocally establishes [Parsons] murdered Fulton and assaulted Pence." (*See id.* at Paragraph 11).

The court convicted Parsons of Murder in the First Degree, Aggravated Assault as to Spence, REAP as to Fulton and Spence, PIC and Firearms not to be Carried Without a License. The same day, it sentenced Parsons to an aggregate term of life without the possibility of parole. Parsons filed a counseled direct appeal that this Court dismissed on January 30, 2018, for his failure to file a brief.

On May 24, 2019, Parsons filed a timely petition pursuant to the Post Conviction Collateral Relief Act, 42 Pa.C.S. §§ 9541-9546, raising an ineffective assistance of counsel claim for direct appeal counsel's failure to file a brief. The court granted the petition and reinstated Parson's direct appeal rights *nunc pro tunc*. He and the court complied with Rule 1924. *See* Pa.R.A.P. 1925.

On appeal, the crux of Parsons' argument challenges the weight and sufficiency of the evidence to support his identification as the shooter, the admission of Detective Whitaker's testimony about his previous knowledge of

Parsons, the testimony of Detectives Whitaker and Jay about their opinions regarding the video surveillance and the credibility of Pena's statement. (**See** Parsons' Brief, at 8).

## II.

### A.

Parsons argues that the trial court abused its discretion in allowing the admission of certain evidence at trial.[7, 8]   Specifically, he maintains that Detective Whitaker should not have been permitted to testify that he was familiar with Parsons through prior police investigations because this testimony was overly prejudicial, that Detectives Whitaker and Jay should not have been permitted to testify about their opinions of the surveillance video where the evidence against him as the murderer was circumstantial and hinged on Pena, who was a "corrupt and polluted source." (**See** Parsons' Brief, at 18; **see id.** at 17).

_____

[7] "Our standard of review for a trial court's evidentiary rulings is narrow, as the admissibility of evidence is within the discretion of the trial court and will be reversed only if the trial court has abused its discretion.  An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill will or partiality, as shown by the evidence of record." **Commonwealth v. Melvin**, 103 A.3d 1, 35 (Pa. Super. 2014) (citations omitted).

[8] Parsons' challenge to the admissibility of evidence is arguably waived where he fails to identify if and where he objected to this evidence at trial.  **See** Pa.R.A.P. 302(a), 2119(e).

**1.**

Parsons argues that Detective Whitaker's testimony that he was familiar with Parsons from prior police interactions was overly prejudicial and should have been excluded pursuant to Pennsylvania Rule of Evidence 403.  (**See** Parsons' Brief, at 17).

> Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or tends to support a reasonable inference or proposition regarding a material fact.  Relevant evidence may nevertheless be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

*Commonwealth v. Danzey*, 210 A.3d 333, 342 (Pa. Super. 2019), *appeal denied*, 219 A.3d 597 (Pa. 2019) (internal quotation marks omitted); *see* Pa.R.E. 401.

Rule 403 provides, in pertinent part, that "[t]he court may exclude relevant evidence if its probative value is outweighed by a danger of … unfair prejudice[.]"  Pa.R.E. 403.  "'Unfair prejudice' means a tendency to suggest a decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially."  Pa.R.E. 403, *Comment*.

As to this issue, the trial court observed:

> Detective Whitaker testified that he had known [Parsons] for seven years, has seen him at least 40 times, and has spoken with him between 10 and 20 times.  He testified he was aware of [Parsons'] voice and physical characteristics and would recognize his voice.  This evidence was admissible as it was directly relevant to his ability to identify [Parsons] on the video surveillance as well as [his] voice on the phone calls, making the identification of

[Parsons], a material fact, more probable. The testimony had a high probative value which was not outweighed by any unfair prejudice to [Parsons]. Th[e trial c]ourt, as the trier of fact, did not assume [Parsons] was guilty simply because he had prior interactions with the police. [Parsons] was found guilty based upon the plethora of other evidence against him.

(Trial Court Opinion, 9/01/20, at 21).

We discern no abuse of discretion. It is well-settled that, "[e]ven if prejudicial information was considered by the trial court, a judge, as fact finder, is presumed to disregard inadmissible evidence and consider only competent evidence." *Commonwealth v. Kearney*, 92 A.3d 51, 61 (Pa. Super. 2014), *appeal denied*, 101 A.3d 102 (Pa. 2014) (citation omitted). Here, Detective Whitaker's statement that he knew Parsons from prior police interactions was not introduced to cast guilt on Parsons, but merely for the proper purpose of allowing the detective to explain how he was able to identify him in the videotape and phone call.

The trial court provided this Court with a fifteen-page recitation of the facts in its opinion, as well as thorough findings of fact and conclusions of law that demonstrate that Parsons' conviction was not based on Detective Whitaker's explanation of how he knew Parsons, but on the other evidence of record. Hence, Parsons is unable to establish that he was prejudiced by the court's admission of Detective Whitaker's testimony about why he recognized Parsons and the trial court did not abuse its discretion in allowing this testimony. This argument lacks merit.

**2.**

Parsons also argues that Detectives Whitaker and Jay should not have been allowed to testify about their opinions of the surveillance video. (**See** Parsons' Brief, at 18). He maintains that this went beyond lay testimony and was not harmless error where the evidence against him was circumstantial and hinged in large part on the testimony of Pena, a "jailhouse informant who was clearly a 'corrupt and polluted source.'" (**Id.** at 18).[9]

Pursuant to Rule of Evidence 701:

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

    (a) rationally based on the witness's perception;

    (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

    (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Pa.R.E. 701.

Technical expertise does not *ipso facto* convert a fact witness, who might explain how data was gathered, into an expert witness, who renders an opinion based on the data. Fact testimony may include opinion or inferences so long as those opinions or inferences are rationally based on the witness's

---

[9] Parsons fails to provide pertinent legal citation or discussion thereof in support of his claim that the detectives should not have been permitted to provide opinion testimony about the videos and why this was not harmless error or provide citation to exactly what the purported "opinions" were. (**See** Parsons' Brief, at 18). Therefore, this issue is waived. **See** Pa.R.A.P. 2101, 2119(a)-(c); **Commonwealth v. Zewe**, 663 A.2d 195, 199 (Pa. Super. 1995) (waiving issue that contained only "vacuous claims" and no legal citation). Moreover, as discussed above, the argument would lack merit.

perceptions and helpful to a clear understanding of his or her testimony.

***Commonwealth v. T.B.***, 232 A.3d 915, 919 (Pa. Super. 2020), *appeal denied*, 240 A.3d 98 (Pa. 2020) (citations, internal quotation marks and brackets omitted).

The trial court explains that:

> The testimony provided by Detective Jay and Detective Whitaker was testimony about their investigation, where they received the footage, the camera angles, and provided th[e c]ourt with clearly understanding what was being shown on the footage. There was no scientific or specialized knowledge required to relay … which camera angles matched which streets. When the information became specialized, the Commonwealth admitted William Popovick as an expert witness in forensic video surveillance. The other testimony provided in regard to the video surveillance was that of Detective Whitaker who testified that he recognized [Parsons] from his years of knowing each other as well as being familiar with his voice and Doctor Jessica Niewodowski who testified that the injuries sustained by [Parsons] matched the man in the video, all testimony covered with Rule 701.

(Trial Ct. Op., at 20).

We agree with the sound reasoning of the trial court. The testimony of Detectives Whitaker and Jay was rationally based on their perceptions of the video surveillance and assisted the court in understanding their testimony. ***See T.B.***, *supra* at 919. Based on our review of the record, there was nothing in their testimony that converted it from lay witness to expert testimony and Parsons fails to provide this Court with any evidence to the contrary. Therefore, this argument lacks merit.

**3.**

Finally, to the extent that Parsons argues that the court should have precluded Pena's testimony because he was a "corrupt and polluted source," we observe that this argument goes to the weight to be afforded the evidence, not its admissibility. In fact, the "corrupt and polluted" source concept refers to a jury charge when an accomplice testifies. Specifically,

> [I]n any case where an accomplice implicates the defendant, the judge should tell the jury that the accomplice is a corrupt and polluted source whose testimony should be viewed with great caution. ... If the evidence is sufficient to present a jury question with respect to whether the prosecution's witness was an accomplice, the defendant is entitled to an instruction as to the weight to be given to that witness's testimony.

*Commonwealth v. Lawrence*, 165 A.3d 34, 44 (Pa. Super. 2017) (citations and internal quotation marks omitted).

As conceded by Parsons, Pena was not an alleged accomplice. (**See** Parsons' Brief, at 18). He argues, however, that "[g]reat caution should have been taken before accepting Pena's testimony" because he was a "jailhouse informant who was clearly a corrupt and polluted source" with "motivation to lie." (Parsons' Brief, at 18). However, he provides no legal authority that such testimony is inadmissible. In fact, based on the language of the jury instruction itself, such testimony **is** admissible, with a jury merely to be cautioned about the weight to be afforded to it. **See** Pa.S.S.J.I. (Crim) 4.01; *Lawrence*, **supra** at 44. Hence, to the extent that Parsons is attempting to

argue that the trial court abused its discretion in admitting Pena's testimony at all, it would fail.[10]

Hence, Parsons has failed to establish that the trial court abused its discretion in admitting the foregoing evidence and Parsons' arguments to the contrary lack merit. **See Melvin**, **supra** at 35.

**B.**

Next, we turn to Parsons' challenges to the weight and sufficiency of the evidence to support his conviction of Murder in the First Degree. (**See id.** at 14-16, 19). He maintains that all "identification evidence stems from the video evidence" and Detective Whitaker's recognition of him from previous interactions. (**See id.** at 15). He also challenges the weight of the video evidence and that of witness Pena because he was a "corrupt and polluted source[]" and claims that the verdict shocks the conscience.[11] (**Id.** at 16; **see id.** at 16).

---

[10] We will consider this testimony as part of our analysis of Parsons' weight of the evidence claim, as he once again challenges this testimony in that argument.

[11] Parsons raises the "shocks the conscience" argument as a separate issue. (**See** Parsons' Brief, at 19). However, the "shocks the conscience" idea goes to the weight of the evidence and, thus, we have included this claim with our review of that issue. **See Clay**, **infra** at 1055.

We begin with our review of Parsons' sufficiency of the evidence challenge.[12]

**1.**

To sustain a conviction for Murder in the First Degree, the Commonwealth must prove that: (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with malice and specific intent to kill. **Commonwealth v. Hitcho**, 123 A.3d 731, 746 (Pa. 2015) (citing 18 Pa.C.S. § 2502(a)). "The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, the fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption

---

[12] "As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances. … Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld." **Commonwealth v. Franklin**, 69 A.3d 719, 722 (Pa. Super. 2013) (citations and internal quotation marks omitted).

of innocence." *Franklin*, *supra* at 722 (citations, quotation marks and brackets omitted).

Parsons challenges the second element. He maintains that the identification was made through Detective Whitaker recognizing him in the video surveillance from previous interactions, and that Detective Graudizio's testimony in which he saw Parsons on the video with two objects in his hands was unhelpful in determining if Parsons possessed the weapon that killed Fulton. (*See* Parsons' Brief, at 15-16).

First, we note that Parsons miscomprehends our standard of review, which mandates that we review **all** evidence of record, not merely one or two pieces of it, in the light most favorable to the Commonwealth. *See Franklin*, *supra* at 722. Additionally, contrary to Parsons' assertion, the record contains testimony from multiple individuals who identified Parsons and the fact that he possessed firearms at the scene of the incident, his statement on the prison telephone, his confession to his cellmate Pena, as well as forensic evidence.

Specifically, Sergeant Blackwell heard rapid gun fire from four houses away, and after arriving at the scene approximately eight seconds later, observed a wounded Parsons staggering behind a black SUV before falling to the ground. Office Swanson collected evidence that included four spent shell casings and a sneaker that matched the one brought in with Parsons at the hospital. Blood samples taken at the scene matched Parsons. Pictures of the burgundy red Buick's rear door and headrest exhibited holes through which a

projectile had passed. In addition to the fact that Detective Whitaker immediately was able to recognize Parsons on the video surveillance that showed Parsons come out from the area in the 800 block of Hughes Street, running after a burgundy red Buick and approaching it as it stopped at an intersection, Detective Jay saw a muzzle flash in the video, followed by Parsons falling to the ground, getting up and limping around a black SUV parked on the street and stumbling down Hughes Street where an individual in a white t-shirt picked up two guns from where Parsons fell. Furthermore, Detective Luby, who knew Parsons, identified him as the individual with the gun in the video

Although Detective Whitaker testified about Parsons' telephone calls from the federal prison after his arrest, the calls were played for the court on which it heard Parsons speaking about the incident and voicing concern about the surveillance cameras capturing his image.

Detective Grandizio examined four bullet specimens from the medical examiner's office and determined that three different firearms were involved in the shooting, a 40-caliber, 9-mm and 44-caliber. He testified that the photographic and bullet evidence was consistent with Parsons running up on the side of the vehicle, shooting through the rear driver's side door and shooting Fulton in the back. He does agree that the surveillance video shows Parsons with objects in his hands that were consistent with firearms. However, consistent with this testimony, expert witness William Popowick

made still photos from the videos from which he was able to identify Parsons with a silver automatic handgun and a muzzle flash. Detective Jay testified that the surveillance videos accurately recorded the time and location of the incident, and that the video clearly showed that one of the individuals who helped him to his feet after he was shot picked up the two firearms he dropped and ran away with them. Expert trauma surgeon Doctor Niewodowski testified that she treated Parsons for a gunshot wound to right lower quadrant, requiring surgery on his bowel and hip, and that the man falling down and hopping behind a black SUV on the video was consistent with a man who suffered Parsons' injuries.

Finally, Pena testified and provided a statement to police that contained specific details Parsons shared with him about his murder of Fulton that were not available to the general public. Parsons told him he ran through a cutaway before running behind the back of the burgundy red vehicle and shooting at the two occupants. He advised that he had two guns on him, that one of the individuals in the car shot back and wounded him, and that he eventually fell between two cars before stumbling away to where his friend picked up his guns and ran off. He described a female officer approaching him and said he hoped that video surveillance did not capture his face.

The foregoing, taken in its totality and viewed in the light most favorable to the Commonwealth as verdict winner, belies Parsons' argument that the

Commonwealth failed to establish that he was the perpetrator of Fulton's murder. His sufficiency of the evidence fails.

**2.**

Alternatively, Parsons argues that his conviction was against the weight of the evidence[13] because "when the quantity and quality of the evidence … is appropriately evaluated, the verdict of guilty on the first-degree murder charge [] shock[s] the conscience." (Parsons' Brief, at 19) (internal quotation marks omitted). He argues that police officers testifying outside their expertise, combined with the ballistics recovered and the testimony of Pena that should have been given less weight, failed to demonstrate his guilt beyond a reasonable doubt.[14] (*See id.* at 16, 19).

---

[13] "Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice." **Commonwealth v. Bright**, 234 A.3d 744, 749 (Pa. Super. 2016), *appeal denied*, 241 A.3d 647 (citation omitted). "[T]he finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." **Id.** (citation omitted).

[14] Parsons maintains that the police testified "outside of their scope of expertise" about their opinions of the video surveillance and that they used prior police contacts as inappropriate means of identification. (Parsons' Brief, at 19). However, he provides no examples of this alleged testimony other

First, we note that the weight of the evidence issue is waived where Parsons failed to raise it in the trial court. *See Commonwealth v. Cox*, 231 A.3d 1011, 1018 (Pa. Super. 2020); Pa.R.Crim.P. 607(a)(1)-(3); *see also id.* at *Comment*. Moreover, it would not merit relief.

It is well-settled that "[a] new trial based on a weight of the evidence claim is only warranted where the jury's verdict is so contrary to the evidence that it shocks one's sense of justice." *Commonwealth v. Akr*ie, 159 A.3d 982, 989 (Pa. Super. 2017).

> When the challenge to the weight of the evidence is predicated on the credibility of trial testimony, our review of the trial court's decision is extremely limited. Generally, unless the evidence is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, these types of claims are not cognizable on appellate review.

*Commonwealth v. Akrie*, 159 A.3d 982, 989-90 (Pa. Super. 2017) (citation omitted).

Here, other than his own allegation, Parsons provides no evidence for his bald assertion that the ballistics were inaccurate or that the court should not have given any weight to Pena's testimony because he was a "polluted

---

than that provided previously regarding Detective Whitaker. Because we already found that the trial court did not abuse its discretion in admitting this testimony, and we are not aware of any other testimony to which Parsons might be referring, we will confine our review to his argument regarding Pena.

He also maintains that this testimony, combined with that of Pena, resulted in the Commonwealth failing to establish his guilt beyond a reasonable doubt. (*See id.*). This is a sufficiency of the evidence argument, not weight.

source" hoping for a "reduction or dispensation regarding his own open case." (Parsons' Brief, at 16; *see id.* at 19). The trial court acknowledged that Pena admitted on cross-examination that his record did not reflect all his arrests, that he had several aliases and that he had not been sentenced in his own case, before concluding that his testimony regarding what Parsons told him was credible and consistent with the other testimony and evidence. It also concluded that the ballistics evidence was accurate and Parsons provides no evidence to the contrary. Therefore, we will not upset these credibility determinations. *See Commonwealth v. Scott*, 146 A.3d 775, 778 (Pa. Super. 2016) ("We will not disturb the factfinders' credibility findings, which are supported by the evidence of record.").

As to the totality of the weight of the evidence to support Parsons' conviction, the court found:

> … [E]ven if the claim should not be considered waived, as the trier of fact, this [c]ourt was free to believe all, part, or none of the evidence presented. This [c]ourt listened intently to all of the testimony, had the opportunity to not only hear the testimony but also observe the witnesses' demeanor and expressions. The testimony put for by each and every Commonwealth witness was truthful and corroborated by other witnesses as well as the video surveillance. Nothing in the testimony leads any credence to [Parsons'] argument that this [c]ourt erred in its finding that the witnesses provided credible testimony. In stark contrast, the physical evidence admitted at trial matches the testimony provided so clearly that this [c]ourt cannot ascertain where [Parsons] would find support for his argument. There was nothing so contrary to the evidence as to shock one's sense of justice such that [Parsons] be awarded be a new trial.

(Trial Ct. Op., at 19).

We discern no abuse of discretion in the court's conclusion that the credible weight of the evidence supported Parsons' conviction. Hence, this issue lacks merit. For all of the foregoing reasons, we affirm the judgment of sentence.

Judgment of sentence affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 4/15/2021*